## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ALFRED ANDERSON,**

      Plaintiff,

vs.                                 No. CIV-06-620 MCA/LCS

**THE CLOVIS MUNICIPAL SCHOOLS,**
**RHONDA SEIDENWURM, in her official**
**capacity as Superintendent of Schools, and**
**individually, and ADAN ESTRADA, in his**
**official capacity, and individually,**

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendants' Motion for Summary Judgment* [Doc. 56], filed March 14, 2007; Defendants' *Motion for Summary Judgment Limiting Damages to the Contract Term* [Doc. 58], filed March 15, 2007; Defendants' *Motion in Limine to Bar Evidence of the Witness's Experience Regarding Reading Nursery Rhymes* [Doc. 60], filed March 15, 2007; *Defendants' Motion to Strike Plaintiff's Affidavit Which is Exhibit 8 to Plaintiff's Response to Defendants' Motion for Summary Judgment* [Doc. 71], filed April 13, 2007; *Defendants' Motion in Limine to Bar Evidence of Historical Racial Segregation in Clovis or Carlsbad Schools and any Remark Plaintiff Contends Related Thereto* [Doc. 73], filed April 13, 2007; and Plaintiff's *Motion to Strike Exhibits A and B to the Reply Memorandum in Support of Summary Judgment* [Doc. 85], filed April 26,

2007.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants *Defendants' Motion for Summary Judgment* [Doc. 56] with respect with respect to Counts I, II, and III of the *Complaint* and declines to exercise supplemental jurisdiction over the state-law claim asserted in Count IV.  The Court denies all remaining motions as moot.

## I. BACKGROUND

Plaintiff Alfred Anderson is an African-American male who is over 40 years of age. After receiving a Masters Degree in special education from Eastern New Mexico University in 1999, Plaintiff began working in August 2000 as a Level I special-education teacher at Bella Vista Elementary School ("Bella Vista") in Clovis, New Mexico.  Between the years 2000 and 2005, Plaintiff received "generally good" performance evaluations.  In August 2005, by which time Plaintiff had become a Level III special-education teacher, Adan Estrada became principal of Bella Vista and Plaintiff's supervisor.  Plaintiff contends that from the time Mr. Estrada became his supervisor, Mr. Estrada treated Plaintiff differently from similarly situated younger, white employees and reprimanded Plaintiff for conduct for which similarly situated younger, white employees were not admonished.  [Doc. 1 at 2-3].

For example, Plaintiff maintains that Mr. Estrada placed him on a Professional Growth Plan in order to address alleged deficiencies in Plaintiff's performance, but constantly changed the goals under the Plan so that Plaintiff could not satisfy them.  Plaintiff also alleges that he had a greater student load than similarly situated younger, white employees, and that he was reprimanded when a student in his class misbehaved, even

though similarly situated younger, white employees were not punished for like conduct. Additionally, Plaintiff contends, among other things, that he was (1) the only Level III special-education teacher to be evaluated every year (rather than every three years); (2) removed from participation in the after-school program despite adequate performance; and (3) denied opportunities for professional development. According to Plaintiff, he attempted to meet with Rhonda Seidenwurm, Superintendent of the Clovis Municipal Schools, on a number of occasions to resolve his issues with Mr. Estrada, but Dr. Seidenwurm was of no assistance and, instead, merely ratified Mr. Estrada's actions. On January 9, 2006, Plaintiff resigned in what he calls a constructive discharge. [Doc. 1 at 3-5]. He represents that "[t]he situation [had] bec[o]me so unbearable for [him] that no reasonable person would tolerate the conditions of employment." [Doc. 66 at 4]. Plaintiff currently works as a special-education teacher in Oklahoma in a position he secured before resigning from Bella Vista. [Id.; Exh. A, Anderson depo. at 150-153].

On November 25, 2005, which also was prior to his resignation, Plaintiff filed a *Charge of Discrimination* ("the first *Charge*") with the EEOC. [Doc. 65; Exh. AA]. He checked boxes indicating that the alleged discrimination was race-based and constituted a continuing action, which began February 1, 2005 and ended October 18, 2005. [Id.]. He also explained:

> I am currently employed by the Respondent as a Special Education Instructor. Beginning in February 2005 and continuing on a continuous basis I have been subjected to adverse terms and conditions unlike my peers. Specifically, my case manager duties have been assigned to a regular teacher

despite my credentials; reprimanded for identical alleged violations as other instructors but other instructors not reprimanded; denied opportunity for professional development; required to perform duties different from my race, White peer; and ultimately replaced in the Respondents after school program on or about October 18, 2005.

I believe that I have been discriminated against because of my race, Black, in violation of Title VII of the Civil Rights Act of 1964 as amended.

[Id.].  The EEOC issued a *Dismissal and Notice of Rights*, detailing Plaintiff's right to sue, on April 11, 2006.  [Id.].  On June 17, 2006, Plaintiff filed another *Charge of Discrimination* ("the second *Charge*") with the EEOC.  On this document he checked boxes indicating that the alleged discrimination was age-based and constituted a continuing violation, which began February 1, 2005 and ended January 9, 2006.   Under the section titled "THE PARTICULARS ARE[,]" Plaintiff explained:

I began employment with the Respondent as a Special Education Instructor on, or about, August 1, 2000.  Beginning in February 2005, and continuing until I resigned, I was subjected to adverse terms and conditions unlike my peers. These terms and conditions include, but are not limited to, that my case manager duties were assigned to regular teachers and staff despite my credentials; I was reprimanded for alleged violations that other instructors had been thought to do as well, but other instructors were not reprimanded; I was denied opportunity for professional development; I was required to perform duties different from those performed by others younger than myself; I was placed [sic] in the Respondent's after-school program on, or about, October 18, 2005.  Due to duress, I felt I had no other choice but to resign on January 9, 2006.

I believe that I have been discriminated against because of my age (49) in violation of the Age Discrimination in Employment

4

Act of 1967.

[Id.].  A time stamp on the second *Charge* indicates that it was received by the EEOC on June 20, 2006; the record, however, does not show what subsequent action, if any, the EEOC took with respect to the second *Charge*.

On July 11, 2006, Plaintiff filed his *Civil Complaint for Employment Discrimination, Violation of 42 U.S.C. § 1981; Violation of the Age Discrimination in Employment Act and Breach of Contract* [Doc. 1] against the Clovis Municipal Schools and Mr. Estrada and Dr. Seidenwurm in their individual[1] and official capacities.  Plaintiff alleges employment discrimination on the basis of race, in violation of Title VII, 42 U.S.C. § 2000e *et seq.* (Count I); violations of 42 U.S.C. § 1981 (Count II); employment discrimination on the basis of age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (Count III); and breach of contract (Count IV).  [Doc. 1 at 5-9].  On March 14, 2007, Defendants filed their summary-judgment motion.  [See Doc. 57].

## II. ANALYSIS

### A. Summary Judgment Standard, Fed.R.Civ.P. 56

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

[1]  On November 16, 2006, this Court entered a *Memorandum Opinion and Order* granting *Defendants' Partial Motion to Dismiss* [Doc. 8] and dismissed the Title VII and ADEA claims asserted against Mr. Estrada and Dr. Seidenwurm in their individual capacities.  [See Doc. 33].

moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ." Fed.R.Civ.P. 56(e). Nor will unsupported conclusory allegations create a genuine issue of fact. Harrison v. Wahatoyas, L.L.C., 253 F.3d 552, 557 (10th Cir. 2001). Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Judgment is appropriate as a matter of law if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

"At the summary judgment stage, evidence need not be submitted 'in a form that would be admissible at trial.'" Argo v. Blue Cross & Blue Shield of Kansas, Inc., 452 F.3d 1193, 1199 (10th Cir. 2006) (*quoting* Celotex, 477 U.S. at 324). Rather, because it is the substance or content of the evidence that must be admissible, "[p]arties may, for example, submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form." Id. Additionally, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving

party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

## 1. 42 U.S.C. § 2000e, *et seq.* (Title VII) and 42 U.S.C. § 1981

Title VII makes it unlawful for an employer to, among other things, "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). Section 1981 likewise forbids all intentional racial discrimination in the making or enforcement of private or public contracts and protects employees from racial discrimination both in entering into an employment contract and in enjoying the benefits, privileges, terms, and conditions of employment.  See Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1134 (10th Cir. 2004).  Regardless of which statutory theory he pursues, the plaintiff carries the initial burden of establishing a prima facie case of racial discrimination, which he may do through the presentation of direct evidence or under the indirect burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

"'Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption.'" Hall v. U.S. Dep't of Labor, Admin. Review Bd., 476 F.3d 847, 854 (10th Cir. 2007) (*quoting* Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1207 (10th Cir.1999)).  It requires oral or written statements on the part of a defendant, which show a discriminatory motivation. Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1225 (10th Cir. 2000).  Importantly, "'[a] statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect

illegal animus, and, thus, does not constitute direct evidence.'"  Hall, 476 F.3d at 855

(*quoting* Patten v. Wal-Mart Stores East, Inc., 300 F.3d 21, 25 (1st Cir. 2002)).  Finally,

statements of personal opinion, even those reflecting personal bias or prejudice, do not

constitute direct evidence of discrimination; at most they are only circumstantial evidence

of discrimination because the factfinder still must infer discriminatory intent from them.

Hall, 476 F.3d at 855.

       The burden-shifting analysis borne of McDonnell Douglas, however, is the more

common method of demonstrating racial discrimination, as direct evidence of an employer's

improper racial motivation—if not altogether unavailable—will often be difficult to acquire,

See Price Waterhouse v. Hopkins, 490 U.S. 228, 271 (1989) (O'Connor, J., concurring)

("[T]he entire purpose of the McDonnell Douglas prima facie case is to compensate for the

fact that direct evidence of intentional discrimination is hard to come by.").  A plaintiff

establishes a prima facie case of discrimination under the McDonnell Douglas method by

showing that he (1) belongs to a protected class; (2) was qualified for the position at issue;

(3) suffered an adverse employment action;  and (4) was treated less favorably than others.

Exum, 389 F.3d at 1134 (§ 1981); see also Argo, 452 F.3d at 1201.

        If the plaintiff is able to demonstrate his prima facie case, the burden then shifts to

the defendant/employer to articulate some legitimate, nondiscriminatory reason for the

challenged action. McDonnell Douglas, 411 U.S. at 802. If the defendant/employer satisfies

its burden, the plaintiff must then demonstrate that the legitimate reason is merely a pretext

for racial discrimination.  See Salguero v. City of Clovis, 366 F.3d 1168, 1175 (10th Cir.

2004). The plaintiff typically does so by demonstrating that (1) the defendant's stated reason for the adverse employment action was false; (2) the defendant acted contrary to a written company policy prescribing the action taken by the defendant under the circumstances; or (3) the plaintiff was treated differently from other similarly situated employees who violated work rules of comparable seriousness. Id. at 1176; see also Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000). Individuals are "similarly situated" when they (1) have dealt with the same supervisor; (2) were subjected to the same work standards; and (3) engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. MacKenzie v. City & County of Denver, 414 F.3d 1266, 1277 (10th Cir. 2005). The plaintiff may also establish pretext by showing that the proffered reason for the defendant's action is so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief. Miller v. Automobile Club of New Mexico, Inc., 420 F.3d 1098, 1123 (10th Cir. 2005).

## 2. The Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* (ADEA)

The ADEA was passed "to promote employment of older persons based on their ability rather than age" and "to prohibit arbitrary age discrimination in employment." 29 U.S.C. § 621(b). The ADEA, in part, prohibits an employer from "fail[ing] or refus[ing] to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's age." 29 U.S.C. § 623(a)(1).   To establish a prima facie case of age discrimination in violation of the ADEA, the plaintiff must satisfy the same elements he must satisfy to make out a prima facie case of racial discrimination in violation of Title VII. See Garrison v. Gambro, Inc., 428 F.3d 933, 936 (10th Cir. 2005) ( in case arising under Title VII and the ADEA, the Tenth Circuit "analyze[s . . . ] age and [Title VII] discrimination claims identically.").

It bears noting that the Tenth Circuit, whether in the context of a Title VII or an ADEA claim, liberally defines the phrase "adverse employment action." Sanchez v. Denver Pub. Schs., 164 F.3d 527, 532 (10th Cir. 1998).  Such an action is not limited to one causing monetary loss; instead, courts in this circuit take a case-by-case approach and "examin[e] the unique factors relevant to the situation at hand." Id.  Notwithstanding this liberal approach, the Tenth Circuit "will not consider 'a mere inconvenience or an alteration of job responsibilities' to be an adverse employment action." Id. (quoting Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir.1993)).  Instead, the employer's conduct must be materially adverse to the employee's job status.  "For example, conduct that effects 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits' will be deemed an adverse employment action." Medina v. Income Support Div., New Mexico, 413 F.3d 1131, 1136 (10th Cir. 2005) (quoting Hillig v. Rumsfeld, 381 F.3d 1028, 1032-33 (10th Cir. 2004)).

### 3. Hostile Work Environment

Whether the allegations set forth violations of Title VII, the ADEA, or both, a plaintiff also may pursue a "hostile work environment" theory of discrimination. See Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir. 2007) (race/national origin); MacKenzie, 414 F.3d at 1280 (ADEA). For a claim of hostile work environment to survive a summary-judgment motion, the plaintiff must show that a rational jury could find that the workplace was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. Penry v. Fed. Home Loan of Topeka, 155 F.3d 1257, 1261 (10th Cir.1998). In evaluating whether a working environment is sufficiently hostile or abusive, this Court examines all the circumstances, including (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance. MacKenzie, 414 F.3d at 1280. The environment must be both subjectively and objectively hostile or abusive. Id. In an action brought pursuant to the ADEA, "courts judging hostility should filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of age-related jokes[] and occasional teasing[,]" as well as "offhand comments[] and isolated incidents (unless extremely serious)." Id. Similarly, a Title VII plaintiff "does not make a showing of a pervasively hostile work environment 'by demonstrating a few isolated incidents of racial enmity or sporadic racial slurs. Instead, there must be a steady barrage of opprobrious

racial comments.'" Herrera, 474 F.3d at 680 (*quoting* Chavez v. New Mexico, 397 F.3d 826,

832 (10th Cir. 2005).

### 4. Constructive Discharge

One final legal theory requiring discussion here is that of constructive discharge,

which occurs "'when the employer by its illegal discriminatory acts has made working

conditions so difficult that a reasonable person in the employee's position would feel

compelled to resign.'" E.E.O.C. v. PVNF, L.L.C., --- F.3d ----, 2007 WL 1404310, at *13

(10th Cir. May 14, 2007) (*quoting* Sandoval v. City of Boulder, 388 F.3d 1312, 1325 (10th

Cir. 2004)). A court evaluating whether the complained-of working conditions would cause

such a feeling in a reasonable person applies an objective test under which neither the

employee's subjective views of the situation nor the employer's subjective intent is relevant.

PVNF, 2007 WL 1404310, at *13. The plaintiff's burden in a constructive-discharge case

is substantial, and even showing that the employer's conduct constituted an adverse

employment action is "not necessarily sufficient to establish a constructive discharge

because a constructive discharge requires a showing that the working conditions imposed

by the employer are not only tangible or adverse, but intolerable." Tran v. Trustees of State

Colleges in Colorado, 355 F.3d 1263, 1270-71 (10th Cir. 2004); see also Garrett v.

Hewlett-Packard Co., 305 F.3d 1210, 1221 (10th Cir. 2002) ("The bar is quite high in such

cases: a plaintiff must show he had no other choice but to quit."). "Importantly, in

constructive discharge cases '[t]he question is not whether the employee's resignation

resulted from the employer's actions, but whether the employee had any other reasonable

choice but to resign in light of those actions.'" <u>PVNF</u>, 2007 WL 1404310, at *13 (*quoting*

<u>Tran</u>, 355 F.3d at 1270).

Armed with this fuller understanding of the law of employment discrimination, the

Court now turns to the facts and circumstances of the instant case.

**B. Plaintiff's Contentions**

### 1. Racial Discrimination in Violation of Title VII and 42 U.S.C. § 1981; Age-Based Discrimination in Violation of the ADEA

As explained more fully in Section I. above, on November 25, 2005, Plaintiff filed

his first *Charge of Discrimination* with the EEOC. [Doc. 65; Exh. AA]. He checked the box

indicating that the alleged discrimination was based on race, and explained that between

February 1, 2005 and October 18, 2005 he had been (1) relieved of his case-manager duties;

(2) reprimanded for violations identical to those committed by similarly situated white co-

workers who were *not* punished; (3) denied the opportunity for professional development;

(4) required to perform duties different from those performed by white co-workers; and

(5) replaced in Bella Vista's after-school program. [<u>Id.</u>]. Because Plaintiff also checked a

box indicating that the alleged discrimination was part of a continuing violation, a brief

discussion of the "continuing violation" theory is warranted here.

The filing of an administrative charge with the EEOC is a prerequisite to a civil suit

under Title VII,[2] and a claim will be deemed time-barred if it is not filed within 300 days of

---

[2] The same is true with respect to a civil suit brought pursuant to the ADEA. <u>See</u>
<u>Aronson v. Gressly</u>, 961 F.2d 907, 911 (10th Cir. 1992).

the alleged unlawful employment practice.  See Mascheroni v. Bd. of Regents of Univ. of California, 28 F.3d 1554, 1557 (10th Cir. 1994) (explaining that 300 days are allowed in "deferral states" such as New Mexico, where the EEOC defers to the enforcement efforts of a state agency empowered to undertake employment-discrimination investigations).  In National R.R. Passenger Corp. v. Morgan, the United States Supreme Court eliminated the "continuing violation" theory as applied to discrete acts[3] of discrimination and held that because each such act constitutes a separate actionable unlawful employment practice, a plaintiff raising claims based thereupon must file his administrative charge within the appropriate time period as applied to each.  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114, 123 (2002).  While this rule applied to bar the Morgan plaintiff from suing on claims for which no administrative remedy had been sought when the underlying incidents occurred more than 300 days prior to the filing of his EEO complaint, see id. at 106, the Tenth Circuit has held that "[t]he rule is equally applicable . . . to discrete claims based on incidents occurring after the filing of [the p]laintiff's EEO complaint."  Martinez v. Potter, 347 F.3d 1208, 1210-11 (10th Cir. 2003).  In no uncertain terms, the Tenth Circuit went on to state that "Morgan abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers[.]"  Id. at 1210.  Additionally, "Morgan implicitly overturns prior Tenth Circuit law in that plaintiffs are now expressly precluded from establishing a continuing violation exception for alleged discrete

---

[3]  Discrete acts include—but are not limited to—such "easy to identify" acts as termination, failure to promote, denial of transfer, or refusal to hire.  Morgan, 536 U.S. at 114.

acts of discrimination occurring [outside] the limitations period, even if sufficiently related to those acts occurring within the limitations period." Davidson v. America Online, Inc., 337 F.3d 1179, 1185 (10th Cir. 2003).  Still, even alleged discriminatory actions occurring outside the limitations period may serve as background evidence in support of a timely claim subject to the following caveat:

> [S]uch background evidence cannot suffice [to establish a timely claim] where [there is] no evidence of discriminatory purpose other than (at most) [a] discrete time-barred decision . . . . To decide otherwise would completely undo Morgan's insistence that each discrete discriminatory act starts a new clock for filing charges alleging that act.

Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1223 (10th Cir. 2006) (*quoting* Law v. Continental Airlines, Corp., Inc., 399 F.3d 330, 334 (D.C.Cir.2005)).

Hostile-work-environment claims, however, "do not consist primarily of discrete acts, but often involve a series of incidents that span a period longer than 300 days." Duncan v. Manager, Dep't of Safety, City & County of Denver, 397 F.3d 1300, 1308 (10th Cir. 2005). For this reason, the 300-day filing requirement has proven problematic as to such claims. Morgan thus instructs that "as long as 'an act' contributing to a hostile work environment took place no more than 300 days before the plaintiff filed an EEOC charge, a court may consider the complete history of acts comprising that hostile work environment." Id.  As the Tenth Circuit more fully explained,

> The [Morgan] Court justified this holding, in part, on the repeated nature of the conduct, which occurs "over a series of days or perhaps years." Even so, however, an employee may not unreasonably delay the filing of a hostile work environment

claim. Morgan explains that when analyzing a hostile work environment claim spanning longer than 300 days "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." Morgan emphasizes that there must be a relationship between acts alleged after the beginning of the filing period and the acts alleged before the filing period: "if an act on day 401 had no relation to the acts between days 1-100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the day 401 act." Morgan holds that a series of alleged events comprises the same hostile environment where "the pre- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers."

Id. at 1308-09 (internal citations omitted).

Plaintiff in this case filed his racial-discrimination charge with the EEOC on November 25, 2005, which means that to the extent he alleges *discrete acts* of racially discriminatory conduct (as opposed to acts alleged to have created or contributed to the creation and/or existence of a hostile work environment), this Court may consider as actionable only those acts alleged to have occurred between January 29, 2005 and November 25, 2005, though acts occurring outside this time frame may be considered as background evidence in support of a timely claim.

Plaintiff first maintains that he has presented direct evidence of discrimination, to wit: (1) following Plaintiff's Fall 2004 complaint to Assistant Superintendent Jim McDaniel that he was suffering "mistreatment at the hands of Mr. Estrada[,]" Mr. McDaniel allegedly told

Plaintiff that "I don't know if Mr. Estrada has a problem with your race; he's from Carlsbad, New Mexico[;]" (2) the suggestion that the Carlsbad schools have a history of racial segregation; and (3) Mr. Estrada's allegedly having remarked to Plaintiff at some point in 2005 that "he was glad [Plaintiff] was there as a minority but not as a teacher." [Doc. 66 at 18]. As explained more fully in Section II.A.1. above, direct evidence is evidence that, if believed, proves the existence of a fact in issue *without* inference or presumption. Hall, 476 F.3d at 854. Statements of personal opinion, even those reflecting personal bias or prejudice, do not constitute direct evidence of discrimination but are at most circumstantial evidence of discrimination because the factfinder still must infer discriminatory intent from them. Id. at 855. Additionally, a statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, similarly does not constitute direct evidence. Id.

To the extent that any of the three examples offered by Plaintiff constitutes evidence of racial discrimination, it is at best circumstantial evidence, as a factfinder would necessarily need to infer discriminatory intent from each one. As for (1), this Court is hard-pressed to see how this alleged statement could be any *less* an example of direct evidence because if, in fact, Mr. McDaniel did make such a remark, it appears to reflect his puzzlement and uncertainty over the source of any tension between Plaintiff and Mr. Estrada. This alleged statement on its face makes perfectly clear that Mr. McDaniel simply does not know if race is or is not a contributing factor to the strained relationship between Mr. Estrada and Plaintiff. To find discrimination, a factfinder presented with such a statement would

17

need to make the inferential leap that race did indeed play a part in Plaintiff's alleged mistreatment.  [Doc. 66 at 18].

The same must be said for (2), which would require a factfinder facing such a charge to infer that, because Carlsbad schools were once segregated, and Mr. Estrada hails from Carlsbad, Mr. Estrada, as principal of one of the elementary schools in the Clovis school district, discriminated against Plaintiff on the basis of Plaintiff's race.  As with (1), it is difficult to see how this allegation, even if it were ultimately proven a historical fact,[4] could be any more circumstantial—as opposed to direct—evidence of racial discrimination, as it constitutes an attempt to demonstrate that a practice stricken as unconstitutional more than 50 years ago[5] motivated alleged conduct of 2 years ago.

As for (3), even assuming that Mr. Estrada said he was glad to have Plaintiff at Bella Vista "as a minority" but not as a teacher, "[s]tatements of personal opinion, *even those reflecting personal bias or prejudice*, do not constitute direct evidence of discrimination but are at most circumstantial evidence of discrimination because the factfinder still must infer discriminatory intent from them."   Hall, 476 F.3d at 855 (emphasis added).  As with Mr. McDaniel's alleged remark, then, the factfinder would still need to make the inferential leap that Mr. Estrada's comment was motivated by discriminatory bias, making any such comment the very antithesis of direct evidence.  See id. at 854 (defining direct evidence as

---

[4] Plaintiff has offered no evidentiary support and cites to nothing in the record to back up his contention that the schools of Carlsbad were once racially segregated.

[5] See Brown v. Bd. of Ed., 347 U.S. 483 (1954).

evidence that  proves the existence of a fact in issue without inference or presumption).  For these reasons, the Court rejects Plaintiff's contention that he has presented direct evidence sufficient to establish a prima facie case of racial discrimination and, therefore, turns to the McDonnell Douglas burden-shifting analysis.

For purposes of establishing a prima facie case of discrimination within the burden-shifting framework, the parties appear not to dispute that Plaintiff was (1) a member of a protected class; (2) qualified for the position at issue; and (3) treated less favorably than his co-workers.  See Exum, 389 F.3d at 1134.  Instead, the parties contest only whether Plaintiff suffered an adverse employment action.  [See Doc. 65 at 13-16; Doc. 66 at 19-21].

According to Plaintiff, he was subjected to a number of adverse employment actions in that he was

(1) relieved of his case-manager duties;

(2) removed from Bella Vista's after-school program in October 2005;

(3) denied the opportunity to mentor other teachers in the 2003-04[6] school year and in the Spring of 2005;

(5) issued a written reprimand in the Fall of 2005 for behavior for which a similarly situated white co-worker was not punished;

(6) placed on a Professional Growth Plan in September 2005;

(7) observed by Kathy Goode, an independent evaluator, in the Fall of 2005.

---

[6]  To the extent that this alleged adverse employment action occurred, at least in part, outside the applicable filing period, it will be considered only as background evidence in support of Plaintiff's timely claims.  See Haynes, 456 F.3d at 1223.

(8) constructively discharged;[7] and

(9) treated harshly by Mr. Estrada in the 2003-04[8] school year and in the Fall of 2005.[9]

---

[7] The theory of constructive discharge is discussed separately in Section II.B.3. below.

[8] See supra note 6.

[9] In the first *Charge* he filed with the EEOC, Plaintiff contended that he was required to perform duties different from those performed by his white co-workers. [Doc. 65; Exh. AA]. At his deposition, he elaborated, explaining that he was (1) required to carry a heavier caseload than other teachers; (2) made to turn his lesson plans in to Mr. Estrada; and (3) prevented from attending a professional-development seminar in Albuquerque. [Id.; Exh. A, Anderson depo. at 7-8]. Taking these contentions out of order, the Court concludes that Plaintiff has not established that the requirement that he turn lesson plans in to Mr. Estrada—while arguably inconvenient for him—amounts to an adverse employment action, inasmuch as he has not demonstrated that this requirement materially impacted his employment status. See Sanchez, 164 F.3d at 532 (mere inconvenience will not be considered adverse; instead, there must be significant change in employment status).
      With respect to (1), Plaintiff alleges that during the 2004-05 school year he was made to carry a caseload of 21 or 22 students, while Delayne Duffy, the other special-education teacher who was white and younger than Plaintiff, had only 11. [See Doc. 65; Exh. A, Anderson depo. at 12; Exh. B, depo. of Adan Estrada at 64-70]. (At his deposition, Plaintiff was asked if he believed he carried a heavier caseload than other teachers in school years other than 2004-05. He answered "Yes" for the school year 2000-01; "Unsure" for school years 2001-02, 2002-03, and 2003-04; and "No" for the school year 2005-06. [Doc. 65; Exh. A, Anderson depo. at 10-11]. To the extent that these alleged adverse employment actions occurred outside the applicable filing period, they will be considered only as background evidence in support of Plaintiff's timely claims. See Haynes, 456 F.3d at 1223). When asked to explain this seeming discrepancy, however, Mr. Estrada explained that the State of New Mexico determines instructional load not by number of students, but by student needs. In other words, because "A" level students require less attention and support than "D" level students, a teacher with a greater number of "A" level students could actually bear a less demanding instructional load than a teacher with a smaller number of "D" level students. [Id. Exh. B, Estrada depo. at 67]. Mr. Estrada explained:

> For the '04/05 school year, I have two count dates there. I show a total of 11 students for Mrs. Duffy on both dates. And 15 students for Mr. Anderson on the 40[th] day and 17 students for Mr. Anderson on the 80th day. The breakdown there if we look at the weighted scale, on the 40th day was .63 and on the 80th day was .61 for Mrs. Duffy. For Mr. Anderson it was .69 on the 40th day and then .74 for Mr. Anderson on the 80th day.

[Doc. 66 at 19-21]. Because the inquiry is the same whether the claims arise under Title VII (or § 1981) or the ADEA, see Garrison, 428 F.3d at 936, the Court's ensuing analysis applies equally to Plaintiff's allegations of race- and age-based discrimination.

As an initial matter, the Court determines that certain of the above-listed actions do not, as a matter of law, constitute adverse employment actions. For example, the Tenth Circuit has held that placing a teacher on a Professional Development Plan was not an adverse employment action for purposes of establishing a prima facie case of retaliation

––––––––––––––––––––

[Id. at 70]. Mr. Estrada also testified, however, that not all of Plaintiff's students were in his class at the same time. In fact, according to Mr. Estrada, he could not "remember ever seeing more than eight students there at a time." [Id. at 80-81]. Additionally, Plaintiff was licensed as a Level III teacher, while Mrs. Duffy was a Level I (or entry-level) teacher. As a Level III teacher, Plaintiff had more teaching experience than Mrs. Duffy. [See id.; Exh. C, depo. of Rhonda Seidenwurm at 8 (describing a Level I teacher as a "beginning teacher" and a Level III teacher as someone with "the highest licensure . . . a master's degree and . . . a certain number of years."); Exh. O, depo. of Suzanne Rebman at 14 (explaining that the special-education classes were divided in such a way as to account for Mrs. Duffy's Level I licensure)]. Even Plaintiff himself described a Level III teacher as one with "a greater amount of knowledge and skills necessary and useful to help children achieve." [Id.; Exh. A, Anderson depo. at 90]. The Court concludes that Defendants' decision to assign the more experienced teacher a greater number of students is a legitimate, nondiscriminatory reason for taking the action they did, which Plaintiff has failed to expose as pretextual.

As for Plaintiff's contention that he was denied the opportunity to attend a professional-development seminar in Albuquerque, while co-workers' similar travel requests were granted, [see Doc. 65; Exh. A, Anderson depo. at 10], an email message from Jim McDaniel to Adan Estrada indicates that Plaintiff's attendance at the seminar would not have been a good use of his time, as the subject matter was not related to the goals of the Professional Growth Plan that had been put in place for him. Importantly, Mr. McDaniel suggested alternate methods of ensuring that Plaintiff receive any necessary professional development. [Doc. 65; Exh. M, Oct. 17, 2005 email from Jim McDaniel].

Additionally, the undisputed record evidence reveals that financial considerations also play a part in determining who may attend seminars. David Loadwick, Assistant Director of Support Services, testified that if the subject matter of a training seminar is not relevant to the requesting teacher's work, "we don't usually let them go because our funds are always short.." [Id.; Exh. S, depo. of David Loadwick at 23]. Plaintiff has not demonstrated that Defendants' reasons for denying his request to attend the Albuquerque seminar are pretextual.

under the First Amendment.  Lybrook v. Members of Farmington Mun. Schs. Bd. of Educ.,

232 F.3d 1334, 1339 (10th Cir. 2000).  This Court therefore concludes that the placement

of Plaintiff on a Professional Growth Plan does not amount to an adverse employment action

for purposes of his discrimination claims.[10]

The Court similarly determines that Mr. Estrada's alleged harsh treatment of Plaintiff

does not rise to the level of an actionable adverse employment action.  According to

Plaintiff, Mr. Estrada treated him harshly on at least four occasions: (1) in the Fall of 2003,

when, following an IEP[11] meeting,  Mr. Estrada told Plaintiff, "We all make mistakes," and

also "became very angry at [Plaintiff] and started pointing his finger at [Plaintiff] as he

continued to talk[;]" (2) in the Spring of 2004, when Mr. Estrada denied Plaintiff's request

to work more hours in Bella Vista's after-school program, explaining that he could not rely

on Plaintiff and that Plaintiff was not sufficiently assertive; (3) one afternoon in August

2005, when Plaintiff, who admittedly left an IEP meeting before it had concluded, was told

by Mr. Estrada to be in his office the next morning at 7:30; and (4) during meetings to

_____

[10]  Alternatively, the Court concludes that Defendants have offered a legitimate,
nondiscriminatory reason for placing Plaintiff on the Professional Growth Plan in the Fall of
2005—he admittedly was having "a big problem with performance" as of May 2005, and had
received ratings of "does not meet competency" for licensure level on his 2004-05 annual
evaluation.  [See Doc. 65; Exh. A, Anderson depo. at 24, 143-144].  Plaintiff has offered no
evidence to demonstrate that Defendants' reason for placing him on the Professional Growth
Plan was a pretext for racial discrimination.  [See Doc. 66 at 22 (arguing that the reasons given
for (1) removing Plaintiff from participation in Bella Vista's after-school program; (2) denying
him mentorship opportunities; and (3) relieving him of his case-manager duties were
pretextual)].

[11]  An IEP, or Individualized Education Plan, is a program that is implemented for
special-education students.  [See Doc. 65 at 3].

discuss the Professional Growth Plan, when Plaintiff found Mr. Estrada to be "overbearing, saying 'I am your supervisor and you have to answer to me.'" [Doc. 65; Exh. A, Anderson depo. at 42-44].

"'Unsubstantiated oral reprimands' and 'unnecessary derogatory comments' . . . are not included within the definition of adverse action absent evidence that they had some impact on the employee's employment status." Sanchez, 164 F.3d at 533 (*quoting* Robinson v. City of Pittsburgh, 120 F.3d 1286,1301 (3d Cir.1997)).  Even assuming that Mr. Estrada's alleged remarks amount to unsubstantiated reprimands or unnecessary derogatory comments, Plaintiff has offered no evidence tending to show how the alleged conduct materially impacted his employment status.[12]  See Wells v. Colorado Dep't of Transp., 325 F.3d 1205, 1214 (10th Cir. 2003).  As with Plaintiff's placement on the Professional Growth Plan, then, this Court concludes that Mr. Estrada's alleged harsh treatment of Plaintiff does not amount to an adverse employment action for purposes of his discrimination claims.  See Heno v. Sprint/United Mgmt. Co., 208 F.3d 847, 857 (10th Cir. 2000) (supervisor's "chilly" treatment of plaintiff, which in turn made her feel isolated, did not affect plaintiff's

---

[12]  There also is no evidence that the alleged harsh treatment was based on race or age. To the contrary, the following exchange took place at Plaintiff's deposition:

> Q:    Now, is it your contention that this hash treatment was
>       based on your age or race?
> A:    I don't know.
> Q:    Could it be personality conflicts, personality issues?
>  . . .
> A:    I don't know.

[Doc. 65; Exh. A, Anderson depo. at 48].

employment status such that she could be said to have experienced an adverse employment action); see also Sanchez, 164 F.3d at 533 (explaining that, but for the adverse-affect-on-employment-status standard, "minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.").

Finally, the Court concludes that the reprimand Plaintiff received in the Fall of 2005 does not amount to an adverse employment action.  According to Plaintiff, "[i]n October 2005, [he] was reprimanded by Mr. Estrada for a student misbehaving in class[, whereas] Ms. Gaither[,] a white female teacher had behavior problems in her class room in 2004-05 but was not written up by Mr. Estrada."  [Doc. 66 at 2, 9].

The incident giving rise to the written reprimand apparently took place on October 7, 2005, and was witnessed by Mandy Ratledge, another Bella Vista teacher, and Maria Ratigan, the parent of a Bella Vista student.  Both women described arriving at Plaintiff's classroom and observing an "out of control" scene involving yelling, running, and playing students.  [Doc. 65; Exh. J, Oct. 7, 2005 email from Mandy Ratledge to Adan Estrada].  Ms. Ratigan "became concerned with behavior of all the students in the classroom[, as o]ne child was under a desk screaming and making noises[ and a]ll students were walking around and causing disruption."  [Id.; Exh. K, Oct. 10, 2005 statement of Maria Ratigan].[13]  On October

---

[13]  The October 7, 2005 incident apparently was not an isolated one.  According to Suzanne Rebman, she had observed students in Plaintiff's class out of their seats, talking, and being boisterous, while "[Plaintiff] continued teaching as if that were not occurring."  [Doc. 65; Exh. O, Rebman depo. at 21].  Plaintiff's educational assistant, Lisa Dant, testified that she found Plaintiff's classroom to be in complete chaos "a lot[,]" with students acting out and engaging in activity she believed not to be age-appropriate, such as one child doing his work while lying backwards on his chair.  Yet she observed those same students behaving in other classes.  [Id.;

28, 2005, Mr. Estrada sent Plaintiff a memo under the subject line "Misconduct," stating, among other things,[14] that "[d]uring a meting with [Plaintiff] 10-12-05, related to student behavior problems in the classroom, [Plaintiff] was directed to leave his door open at all times,  [Plaintiff] has failed to do so."  [Id.; Exh. N, Oct. 28, 2005 Memo from Adan Estrada].

"[A] written warning is an adverse employment action '*only* if it effects a significant change in the plaintiff's employment status[.]'"  PVNF, 2007 WL 1404310, at * 8 (*quoting* Haynes, 456 F.3d at 1224 (emphasis in original)).  The warning must, for example, (1) affect the likelihood that the employee will be terminated; (2) undermine his current position, or (3) affect future employment opportunities.  Medina, 413 F.3d at 1137.  Plaintiff has not demonstrated how Mr. Estrada's memo had any material impact on his employment status.[15]

_____

Exh. P; depo. of Lisa Dant at 8, 44].  Mandy Ratledge testified that "[m]ost of the time [Plaintiff's classroom] was out of control, [with] students switching seats, walking around, yelling."  Those same students, however, were respectful in her class.  [Id.; Exh. R, Ratledge depo. at 20].  Literacy Specialist Terri Bryant similarly testified that she witnessed students in Plaintiff's classroom "falling out of their chairs or getting up and running around the room . . . jump across desks . . . get up and walk out of the classroom."  By contrast, she did not observe misbehavior in Delayne Duffy's classroom.  [Id.; Exh. U, depo. of Terri Bryant at 18, 20].

   [14]  The bulk of the memo documents Plaintiff's refusal to comply with the terms of his Professional Growth Plan.  [See Doc. 65; Exh. N].

   [15]  Additionally, a fair reading of the memo reflects that Plaintiff was disciplined not only because his students misbehaved but also because he ignored a subsequent directive to keep his classroom door open for outside observation.  [See Doc. 65;  Exh. N "[Plaintiff] was directed to leave his door open at all times,  [Plaintiff] has failed to do so."].  By contrast, Ms. Gaither, the white teacher who also was spoken to by Mr. Estrada about problems in her classroom, complied with the order to keep her door open.  [See id.; Exh. B, Estrada depo. at 62].  In that regard, therefore, Plaintiff was not reprimanded for conduct for which "other similarly situated white employees were not . . . ."  [Doc. 66 at 2].  The memo additionally details other incidents of Plaintiff's misconduct, concluding that "[y]our direct defiance and refusal to follow the request of your supervisor are an act of misconduct.  Your insubordination has kept you from meeting

In fact, Plaintiff testified that he had already applied for the teaching position he successfully secured and currently holds in Oklahoma on October 8, 2005, which was nearly three weeks *before* Mr. Estrada wrote his memo.  [See Doc. 65; Exh. A, Anderson depo. at 152].  Because Plaintiff has not demonstrated that the issuance of the written reprimand effected a significant change in his employment status, Plaintiff has not shown that the reprimand rose to the level of an adverse employment action.[16]

Assuming without deciding that the remaining alleged actions *do* constitute adverse employment actions, the Court concludes that Defendants have met their burden of showing legitimate, nondiscriminatory reasons for those actions and that Plaintiff has not demonstrated that those reasons were pretextual.  See McDonnell Douglas, 411 U.S. at 802; Salguero, 366 F.3d at 1175.

Plaintiff maintains that he was removed from Bella Vista's after-school program in October 2005.  But Mr. Estrada explained that a district-wide decision was made to replace the full-time teachers who had been working in the after-school program with non-school

---

the needs of the school and students."  [Id.].  Insubordination "has consistently been held to be a sufficient justification for an adverse employment action."  Vukadinovich v. Bd. of Sch. Trustees of North Newton School Corp., 278 F.3d 693, 700 (7th Cir. 2002).

[16]  Alternatively, the Court concludes that Defendants have offered a legitimate, nondiscriminatory reason for issuing the written reprimand—Plaintiff was insubordinate, inasmuch as he refused to obey directives and also admittedly did not comply with the terms of his Professional Growth Plan.  [See Doc. 65; Exh. A, Anderson depo. at 97, 149].  Plaintiff has offered no evidence to demonstrate that Defendants' reason for issuing the written reprimand was a pretext for racial discrimination.  [See Doc. 66 at 22 (arguing that the reasons given for (1) removing Plaintiff from participation in Bella Vista's after-school program; (2) denying him mentorship opportunities; and (3) relieving him of his case-manager duties were pretextual)].

personnel so as to give the teachers a respite from working a full school day and then an additional two hours in the afternoon.[17]  [Doc. 65; Exh. C, Estrada depo. at 72, 78-79]. Plaintiff submits that "this explanation is not worthy of belief because full time teachers from Bella Vista continued in the after-school program in 2005-2006, while Mr. Anderson was excluded." [Doc. 66 at 22].  But according to Mr. Estrada, once the district-wide change was made, Bella Vista teachers worked in the after-school program "[o]nly on a substitute basis and really in emergency cases only."  [Doc. 65; Exh. B, Estrada depo. at 79].  He also explained that "not a single teacher ever came to [him] and said, 'I would like to continue working in the after-school program.'"  [Id.].

Mr. Estrada further testified that Plaintiff's performance in the after-school program was inadequate.  When asked to elaborate, Mr. Estrada stated that Plaintiff "would avoid planning and having real good input into what was being planned.  [Plaintiff] would like the plans to be made for him and he would just go through the motions with the students.  *He was not a supportive peer in the after-school program*."  [Doc. 65; Exh. B, Estrada depo. at 74-75 (emphasis added)].  The Court concludes that Defendants have offered legitimate, nondiscriminatory reasons for Plaintiff's nonparticipation in the after-school program, and that Plaintiff has failed to expose them as pretextual.

As for the remaining alleged adverse employment actions—denying Plaintiff's request to become a mentor; relieving him of his case-manager duties; and causing him to

---

[17]  Trinity Watt, site coordinator for the after-school program, testified similarly.  [See Doc. 65; Exh. Q, depo. of Trinity Watt].

be observed by independent evaluator Kathy Good—the Court concludes that these are all legitimate responses on the part of an employer concerned with employee performance. To the extent that Mr. Estrada denied Plaintiff's request to serve as a mentor in Spring 2005, such a decision is supported by the undisputed evidence that, as of May 2005, Plaintiff was having "a big problem with performance[,]" as well as Plaintiff's admission that he had received some marks of "does not meet competency" on his 2004-2005 school-year evaluation. [Doc. 65; Exh. A, Anderson depo. at 24].

Performance problems similarly triggered Defendants' decision to relieve Plaintiff of his case-manager duties by reassigning his IEPs. Plaintiff was relieved of these duties when he admittedly did not amend his IEPs, as he was asked to do. [See Doc. 66; Exh. 1, Anderson depo. at 82-83].

Finally, the Court rejects any allegation that repeated observations by Dr. Goode amount to an adverse employment action. As an initial matter, the Court notes that these observations occurred in the Fall of 2005, when Plaintiff had already been placed on a Professional Growth Plan (with which he admits he did not fully comply), and been issued two memos detailing various instances of misconduct and pointing out performance problems. Thus, at the time of Dr. Good's observation, Plaintiff's performance issues had been thoroughly documented. It is Clovis Municipal Schools' policy that

> [a]ll employees are subject to administrative monitoring every year. Supervisors and district office administrators will be responsible for the monitoring process. Although no standard method is to be [] employed, it is expected that administrators will observe staff members on a regular and frequent basis in

28

the area of their assigned responsibilities.

[Doc. 65; Exh. A, Anderson depo. at 96].

## 2.  Hostile Work Environment

In his response to Defendants' summary-judgment motion, Plaintiff asserts—apparently for the first time in this litigation[18]—that he was subjected to a racially hostile work environment.  [Doc. 66 at 23-24].  Defendants argue that because Plaintiff raised no such claim before the EEOC, he has failed to exhaust his administrative remedies with respect to it.  Additionally, Defendants contend that "Plaintiff should not now be allowed to raise a new cause of action" that was not previously disclosed in the litigation. Finally, Defendants submit that Plaintiff's claims are insufficient to establish the existence of a racially hostile work environment.  [Doc. 75 at 9-11].  The Court agrees with each point made by Defendants and addresses each one in turn.

Exhaustion of claims before the EEOC is a prerequisite to federal-court jurisdiction. MacKenzie, 414 F.3d at 1274.  Moreover, "[a] plaintiff's claim in federal court is generally limited by the scope of the administrative investigation *that can reasonably be expected to follow the charge of discrimination submitted to the EEOC*."  Id. (emphasis added).  In this case, Plaintiff submits in his response to the motion for summary judgment that he was a victim of a racially hostile work environment, but he made no such claim in—nor can any

---

[18]  A review of Plaintiff's *Complaint*, as well as the parties' *Initial Pretrial Report*, discloses no allegation of a racially hostile work environment.  [See Docs. 1, 22].  Similarly, Plaintiff makes no such assertion in either the first or second *Charge of Discrimination* he filed with the EEOC.  [See Doc. 65; Exh. AA].

such claim reasonably be gleaned from—the first *Charge* he filed with the EEOC, in which he asserted that he had been discriminated against on the basis of race.  [See Doc. 65; Exh. AA].  Plaintiff's failure to exhaust his hostile-work-environment claim before the EEOC prevents him from raising it for the first time here.[19]  See id. n.13.

Alternatively, this Court concludes that Plaintiff's allegations are insufficient to demonstrate the existence of a racially hostile work environment.  In order to sustain such a claim, Plaintiff must demonstrate that "a rational jury could find that the workplace was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment.  Penry, 155 F.3d at 1261.  It is not enough for him to demonstrate "'a few isolated incidents of racial enmity or sporadic racial slurs.  Instead, there must be a steady barrage of opprobrious racial comments.'"  Herrera, 474 F.3d at 680 (*quoting* Chavez v. New Mexico, 397 F.3d 826, 832 (10th Cir. 2005).

Taking the allegations in a light most favorable to Plaintiff, he was subjected to two race-based comments during his five-year tenure at Bella Vista.  The first of these allegedly

---

[19]  To be sure, this Court may construe Plaintiff's inclusion of the new allegation in his response to the summary-judgment motion as a potential request to amend his *Complaint*.  See Martinez, 347 F.3d at 1211; Viernow v. Euripides Dev. Corp., 157 F.3d 785, 790 n. 9 (10th Cir. 1998) ("Issues raised for the first time in a plaintiff's response to a motion for summary judgment may be considered a request to amend the complaint, pursuant to Fed.R.Civ.P. 15.").  Still, the Court must balance one party's request to amend against such considerations as undue prejudice to the opposing party and futility of the amendment.  Castleglen, Inc. v. Resolution Trust Corp., 984 F.2d 1571, 1585 (10th Cir. 1993).  In this case, to the extent Plaintiff is moving to amend his *Complaint* to add a claim of hostile work environment, the Court concludes that any such motion  must be denied on grounds of (1) undue prejudice to Defendants, and (2) futility of adding a claim that remains administratively unexhausted.

occurred when Jim McDaniel is supposed to have told Plaintiff that he did not know "if Mr. Estrada has a problem with your race, he's from Carlsbad, New Mexico," and the second when Mr. Estrada "made it a point to tell [Plaintiff] that he was glad [Plaintiff] was there as a minority but not as a teacher." [Doc. 66 at 18]. As an initial matter, the Court notes that two comments over five years does not amount to a steady barrage of opprobrious racial comments. See Witt v. Roadway Exp., 136 F.3d 1424, 1432 (10th Cir. 1998) (two racially offensive comments made over the course of two years did not, as a matter of law, constitute a steady barrage of opprobrious racial comments). At most, such comments would be considered isolated incidents of racial enmity. Nor has Plaintiff demonstrated that the alleged conduct was physically threatening or humiliating, or that it unreasonably interfered with his work performance. See MacKenzie, 414 F.3d at 1280. In short, "[t]he record simply fails to substantiate Plaintiff's allegation that [Defendants] continually subjected him to racial slurs in the workplace." Ford v. West, 222 F.3d 767, 777 (10th Cir. 2000).

### 3. Constructive Discharge

Plaintiff lastly contends that he was constructively discharged from Bella Vista inasmuch as his working environment had become so intolerable that no reasonable person in his position could have endured it. He represents that he

> was repeatedly scolded, observed, and reprimanded while other similarly situated teachers were not. He was denied access to needed basic equipment (desk, file cabinet, computer, smart board), while white teachers received the equipment. Mr. Estrada was harsh in his dealings with [Plaintiff] but fraternized with the white teachers. [Plaintiff] was required to deal with almost twice the number of students as the other special

education teacher at Bella Vista.  His request to be a mentor was turned down repeatedly by Mr. Estrada.

[Doc. 66 at 21].

As an initial matter, the Court notes that Plaintiff did raise a claim of constructive discharge with the EEOC, but only as it pertained to his allegations of age-based discrimination.  To be sure, in the second *Charge*, Plaintiff detailed the adverse terms and conditions to which he believed he had been subjected, then stated that "[d]ue to duress, I felt I had no other choice but to resign on January 9, 2006."  [Doc. 65; Exh. AA].  By contrast, the first *Charge*, which alleges race-based discrimination, is silent as to a claim of constructive discharge.  [See id].  Exhaustion of claims before the EEOC is a prerequisite to federal-court jurisdiction.  MacKenzie, 414 F.3d at 1274.  Because Plaintiff has not administratively exhausted his constructive-discharge claim as it relates to race, this Court is without jurisdiction to consider it.  Accordingly, the Court turns to the constructive-discharge claim as it relates to age.

In his response to Defendant's summary-judgment motion, Plaintiff sets forth a number of examples of working conditions that he asserts made his time at Bella Vista so intolerable that he had no option but to resign.[20]  [See Doc. 66 at 21].  The examples Plaintiff provides, however, all appear to relate to his claim of race-based discrimination. [See id.

---

[20]  To summarize what has already been more fully set forth, Plaintiff alleges that (1) he was repeated scolded, observed, and reprimanded; (2) he was denied access to needed basic equipment; (3) Mr. Estrada dealt with him harshly; (4) he was made to carry an unfairly heavy caseload; and (5) his requests to be a mentor were repeatedly turned down by Mr. Estrada.  [See Doc. 66 at 21].

(alleging the denial of needed equipment "while white teachers received the equipment[,]" and asserting that Mr. Estrada "was harsh in his dealings with [Plaintiff] but fraternized with the white teachers.")].  Plaintiff does not show how the examples he cites relate in any way to his age.

At his deposition, Plaintiff explained that he felt pressure to resign. When asked to elaborate, Plaintiff responded as follows:

> Well, I, for one, had been required to change IEPs, which I believe were not necessary.  I was also, for the third consecutive year, being put on an evaluation cycle.  I was receiving a very high level of observation and I was really not given the opportunity to do my job that I felt competent to do.  I felt ganged up on by several people that were trying to encourage me to participate in this inclusion process the way Mr. Estrada wanted it to go.  And I felt all alone oftentimes because . . . I was caught off-guard several times in regards to meetings and not having the opportunity to—I might say not having the resources to respond in the best way I knew how.

As with his other allegations, however, Plaintiff has not demonstrated how the pressure he felt to resign was due to age-based discriminatory conduct.  Additionally, Plaintiff testified that he accepted the job he now holds in Oklahoma *before* he resigned from Bella Vista. [Doc. 66; Exh. A, Anderson depo. at 153].  When an employee "resigns of h[is] own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged."  Baca v. Sklar, 398 F.3d 1210, 1216 (10th Cir. 2005) (*quoting* Jeffries v. Kansas, 147 F.3d 1220, 1233 (10th Cir.1998)).  This Court concludes that Plaintiff has not overcome the high bar in a constructive-discharge case of showing that he had no other choice but to quit.  See Baca, 398 F.3d at 1216.

On the basis of the foregoing, the Court will enter summary judgment for Defendants on Counts I, II, and III of the *Complaint*.  The Court now turns to Count IV, in which Plaintiff asserts a state-law claim for breach of contract.

### 4. Breach of Contract

In Count IV of his *Complaint*, Plaintiff asserts a claim for breach of contract.  In so doing, Plaintiff invokes this Court's supplemental jurisdiction.  [See Doc. 1 at 2 ("The court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's claim of breach of contract because Plaintiff's claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.")].

Section 1367 of Title 28 of the United States Code provides, in pertinent part, that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ." 28 U.S.C. § 1367(a).  Pursuant to subsection (c), however, the Court may decline to exercise its supplemental jurisdiction if, among other things, it has dismissed all claims over which it had original jurisdiction.  28 U.S.C. § 1367(c)(3).  In other words, once "the bases for federal subject matter jurisdiction have been extinguished[,] the district court may decline to exercise continuing 'pendent or supplemental jurisdiction over [the] plaintiff's state claims."  Lancaster v. Indep. Sch. Dist. No. 5, 149 F.3d 1228, 1236 (10th Cir. 1998) (dismissing without prejudice plaintiff's claims for, *inter alia*, breach of contract after having

entered summary for defendant on plaintiff's First and Fourteenth Amendment claims); see also Taylor v. Meacham, 82 F.3d 1556, 1564 n.1 (10th Cir. 1996) ("Once a federal court dismisses claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over related state law claims.").

In the instant action, the entry of summary judgment in favor of Defendants on Counts I, II, and III of the *Complaint* extinguishes the basis for federal subject matter jurisdiction.  See Lancaster, 149 F.3d at 1236.  Accordingly, the Court declines to exercise its supplemental jurisdiction over Plaintiff's breach-of-contract claim.  See 28 U.S.C. § 1367(c)(3).  In so declining, the Court has considered whether the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction.  See Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 541 (10th Cir. 1995).  The Court is not convinced that these factors weigh in favor of retaining jurisdiction.  The employment policies that are the subject of Plaintiff's breach-of-contract claim are those of the Clovis Municipal School system and, thus, creatures of state law best suited to adjudication in a state court.  Notions of comity and federalism demand that a state court try such claims in the first instance, absent compelling reasons to the contrary.  See Thatcher Enters. v. Cache County Corp., 902 F.2d 1472, 1478 (10th Cir. 1990).  In addition, the Court's decision not to exercise supplemental jurisdiction is not necessarily fatal to Plaintiff's state-law claim, as 28 U.S.C. § 1367(d) may provide for the tolling of any limitations period regarding this claim.  For these reasons, Plaintiff's claim for breach of contract will be dismissed without prejudice. See Lancaster, 149 F.3d at 1236 (where district

court had entered summary judgment for defendant on plaintiff's federal claims, affirming district court's decision to dismiss without prejudice plaintiff's state-law claims)

## III. CONCLUSION

For the above-stated reasons, the Court concludes that Defendants are entitled to summary judgment with respect to Counts I, II, and III of Plaintiff's *Complaint*. Because the bases for federal jurisdiction are extinguished as a consequence of this entry of summary judgment, the Court declines to exercise supplemental jurisdiction over the breach-of-contract claim set forth in Count IV. Finally, the Court denies as moot all remaining motions.

**IT IS, THEREFORE, ORDERED** that *Defendants' Motion for Summary Judgment* [Doc. 56], is **GRANTED** with respect to Counts I, II, and III of the *Civil Complaint for Employment Discrimination, Violation of 42 U.S.C. § 1981; Violation of the Age Discrimination in Employment Act and Breach of Contract;*

**IT IS FURTHER ORDERED** that Plaintiff's state-law claim for breach of contract (Count IV) is **DISMISSED WITHOUT PREJUDICE;**

**IT IS FURTHER ORDERED** that Defendants' *Motion for Summary Judgment Limiting Damages to the Contract Term* [Doc. 58], is **DENIED** as moot;

**IT IS FURTHER ORDERED** that Defendants' *Motion in Limine to Bar Evidence of the Witness's Experience Regarding Reading Nursery Rhymes* [Doc. 60], is **DENIED** as moot;

**IT IS FURTHER ORDERED** that *Defendants' Motion to Strike Plaintiff's Affidavit*

*Which is Exhibit 8 to Plaintiff's Response to Defendants' Motion for Summary Judgment* [Doc. 71], is **DENIED** as moot;

   **IT IS FURTHER ORDERED** that *Defendants' Motion in Limine to Bar Evidence of Historical Racial Segregation in Clovis or Carlsbad Schools and any Remark Plaintiff Contends Related Thereto* [Doc. 73], is **DENIED** as moot;

   **IT IS FURTHER ORDERED** that Plaintiff's *Motion to Strike Exhibits A and B to the Reply Memorandum in Support of Summary Judgment* [Doc. 85], is **DENIED** as moot.

   **SO ORDERED** this 31st day of May, 2007, in Albuquerque, New Mexico.


                                   **M. CHRISTINA ARMIJO**
                                   United States District Judge